02-08-364-CR















 
 
 
 
 
 
 




 

 

 

 

 

 

                                                COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

                                                 NO.
2-08-364-CR

 

MICHAEL ANTHONY KELLY                                                              APPELLANT

 

                                                             V.

 

THE STATE OF TEXAS                                                                             STATE

 

 

                                                       ------------

 

              FROM
THE 213TH DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------

I. 
Introduction

In two
points, Appellant Michael Anthony Kelly appeals his conviction for murder.  We affirm.

II.  Procedural Background

We
discuss the evidence in greater detail below, but, in short, bad blood between
a drug dealer and a dancer culminated in a rapper=s death
after a shooting outside an after‑hours club in Arlington, Texas.  Kelly was charged with the death of the
rapper, Sheena Perkins.  The jury
disregarded his self defense and defense of a third person claims and found him
guilty of murder.  In a special
punishment issue, the jury found sudden passion arising from adequate cause and
assessed fifteen years= confinement as punishment.  See Tex. Penal Code Ann. ' 19.02(a),
(d) (Vernon 2009).  This appeal followed.

III.  Self Defense

In his
first point, Kelly claims that he is entitled to a new trial because the great
weight and preponderance of the evidence shows that he acted in self defense so
that it is manifestly unjust that he was convicted of Sheena=s murder.

A.  Evidence

To fully
explain the events that led the State to charge Kelly with causing Sheena=s death,
the jury had to understand the history between the drug dealer, Jonathan AJ.J.@ Coffey, and the dancer, Chasity AChat@ Clark.

1.  Events in November and December 2006 Leading
to Shooting

J.J., a high school dropout in his mid-thirties and
father of six, was incarcerated at the time of the trial because he had pleaded
guilty to a federal felon-in-possession-of-a-firearm charge.[2]  He and Oneil AO.C.@ Coombs Mahoney became partners
in drug dealing in 2006; neither was otherwise employed.  J.J. was married to
Cyntrell Mitchell and had relationships with O.C.=s sister Telethia and with Sheena.[3]

O.C. had been arrested multiple times, and J.J. had spent around $25,000 to bail him out three of
those times.  J.J.
did not bail O.C. out a fourth time.  Chat, a dancer at Club Hard Bodies and Harlem
Nights, had been O.C.=s
girlfriend for three years.[4]  It is undisputed that J.J.=s failure
to bail out O.C. angered Chat and led to a physical
altercation in November 2006 between her and J.J.=s Asister,@ Samantha
Coffey.[5]

J.J. described the altercation as a loud, heated
argument that started when he arrived at the apartment he used for drug
sales.  Chat and Portia (another woman J.J. dated) were there when he arrived.  Chat confronted J.J.
about O.C., and then Samantha and Chat began fighting
over Chat=s Agoing off
on [J.J.] like that.@  The fight ended when Samantha threw Chat out
of a window.

J.J. said that Chat and Portia left the apartment but
returned twenty minutes later with Rico, someone he knew through O.C.  J.J. stated that Chat made threats to him like AI=ll have you killed.@  The argument continued until Samantha
threatened to call the police.

J.J. testified that he returned to the apartment a few
days after the fight.  He answered a
knock at the door, and three or four people entered, shot him in the head, and
robbed him of around $17,000.  J.J. figured that Chat was responsible for the robbery
because only she and O.C. knew where he had hidden
the money, and O.C. was still in jail.  Chat testified that she started receiving
threats from J.J. like ABitch, I=m going
to kill you,@ AYou dead
when I see you,@ and AI want my
money,@ and that
J.J. initially made twenty to thirty threats a day,
then five to seven per day, and finally stopped when O.C.
was released from jail a week after the robbery.  Chat stated that she took these threats
seriously and said that she had seen J.J. with guns
on several occasions. 

J.J. tried to track Chat down, going with his friend
Donna Dears to the clubs where Chat worked and telling people that Chat had
stolen from him.  J.J.
recalled making threats to Chat throughout December
2006, including that he was going to have her beaten up and have other women
assault her, but he said that this was after she threatened him first.[6]  J.J. denied telling
Chat that he was going to kill her, and he stated that he only started carrying
a gun after he had been shot during the apartment robbery.

Kelly,
who was thirty-four years old at the time of trial, testified that he was a
high school graduate, had taken two years of college courses, and had worked
for United Parcel Service for fourteen years before suffering an injury.  At trial, he was married but separated and
had three children with his wife in addition to a baby with Chat.  He met Chat at Club Hard Bodies.

Kelly
testified that Chat told him about the fight at J.J.=s
apartment and J.J.=s
threats.  Chat stated that Kelly told
her, A[W]ell,
just stay away from over there,@ and that
she could hang out with him Ato avoid
all that.@ 
Chat and O.C. split up not long after O.C. got out of jail, and she and Kelly started
dating.  Kelly stated that, other than
Chat, he did not know anyone involved prior to the shooting and that he did not
try to meet or confront J.J. in any way after Chat
told him about the November fight and the threats.

 








2.  The Afterlife

The
Afterlife is an after-hours club located at 2612 Avenue E East in
Arlington.  The shooting occurred between
the club=s front
parking area and the street.  Roy Carter,
one of the club=s valets,[7]
and Arlington Police Officer Duncan J. Durham described the Afterlife=s parking
area:

There is
a parking lot directly adjacent to the club=s
entrance that contains three spaces near the entrance (Roy=s Aexpensive@ parking,
also known as AVIP@
parking); additional spaces along the side of the building and a parking lot in
the back of the building (Roy=s Aregular
parking@); and a
parking lot that belongs to an adjacent building, which is separated from the
Afterlife property by a curb (Roy=s Aat your
own risk@
parking).  Officer Durham testified that
there were several ways to access the back parking lot from the street.  State=s Exhibit
33, an aerial photograph, shows that the parking lot at the front and side of
the club is connected to the club=s back
parking lot.

J.J. testified that he and Chat were regulars at the
Afterlife and that he met Sheena there through their mutual friend Monty Wayne,
another rapper.  Roy confirmed that J.J. was a regular, but he testified that before February
25, 2007, he had never seen Chat, Kelly, or Sheena at the Afterlife.

3.  February 25, 2007

a.  Before the
Shooting

J.J. and Sheena each took two or three Ecstasy pills
on February 24 and decided to go to the Afterlife.  Samantha had been drinking and smoking Aweed@ at
another club when she called J.J., who told her to
meet them at the Afterlife.

The
Afterlife was crowded.  J.J. testified that he and Sheena arrived at the club when
it opened around 2 a.m.[8]  He backed the custom-painted purple Suburban
he was driving into one of the three VIP parking spaces at the club=s front
entrance. J.J. did not pay the valet charge.  Roy stated that, at the time, he assumed he
would receive his parking fee later since J.J. was a
regular.

Samantha
met J.J. and Sheena outside the Afterlife.  J.J. gave her an
Ecstasy pill, which she took before they went inside.[9]  J.J. stated that
security searched him for weapons when he entered the club,[10]
and then he, Samantha, and Sheena went into an area with a backdrop for
photographs and posed for several photos with a group.  J.J. testified that
the photos show some people (but not him) throwing gang signs,
that he did not recognize some of the gang signs Sheena was making, and
that he was not a gangster.

Kelly and
Chat both testified that it was Chat=s idea to
go to the Afterlife that night and that they had been
there a few times before, including Valentine=s Day,
when Dwight Hollis, a photographer, took their photo.[11]  Chat stated that she did not think J.J. was going to be there on February 25, but she did not
explain why she thought this.

There is
some conflict in the testimonies about when Chat and Kelly arrived at the
Afterlife and how they got into the club. 
Roy testified that he thought they had arrived before J.J. and that Kelly offered him $50 to get into the club
without waiting in line.  He said that he
directed Kelly to someone who could get them in.  He also testified that although the Afterlife=s front
door security searches people to keep weapons out, a person can pay some money
and get in through a side or back door with a weapon.

Chat and
Kelly both testified that they arrived around 3 a.m.  Kelly testified that he asked the valet about
prices for the different parking areas and then requested a parking spot Alike near
ways upsideCside the club.@  Then they waited outside at the club=s front
entrance for around twenty minutes before he was ready to give up and go home.[12]  He and Chat were walking back to his car when
one of the parking attendants told him to hold on and told another guy to take
them to the side entrance.  Kelly stated
that there was a crowd at the side door too, that they paid the regular fee to
get in, and that they were searched by security as they went in.

According
to J.J., Chat and Kelly walked into the photo area
around thirty to forty minutes after he, Sheena, and Samantha arrived, while
they were taking photos.  He said that he
had never seen Kelly before that night, and Kelly said the same about J.J.

Chat said
that when she saw J.J. in the photo area, she said to
Kelly, AThere go
that nigger right there,@ explaining that she meant Athat=s the one
that had all this shit going on, you know; the one that was threatening me and
pretty much the one that=s harassing me.@  Kelly testified that he told Chat, A[>J]ust, you know, don=t worry
about it too much.[=]  It had been likeCit had
been like awhile since the fight, so I felt like, you know, they probablyChe
probably would let it die down or wouldn=t be so
angry as he was at first.@

J.J. stated that when he saw Chat and Kelly, he said
to Monty, ALook at that bitch right there
coming in the door,@ or words to that effect.  J.J. said Chat
turned around because she heard him, but Kelly pushed her in the back and told
her to go on.  Kelly testified that as
they walked through, he heard J.J. say to the guy
standing next to him, AI can=t stand
that bitch.  I want to kick her ass.@  Kelly said that they kept walking and that he
did not confront J.J.[13]  Chat said that J.J.
saw her but did not say anything to her and that she and Kelly decided to
finish their drinks and leave.  Kelly
stated that they did not leave at once because Chat asked him if they could
finish their drinks first.

(1)  In the VIP RoomCTestimony

Chat led
Kelly into a nearby room (the AVIP room@) to
finish their drinks, and they sat down on the left side of the room.  Chat testified that there were three or four
people in the room when they entered, but Kelly said he thought they were
alone.

J.J. stated that while he
continued taking photos, Samantha and Sheena left and that he later joined them
in the VIP room.  Samantha testified that
Sheena had rolled a blunt, that she, Sheena, and J.J.
were all smoking in the VIP room, and that she had seen Chat and Kelly in the
photo area thirty to forty-five minutes before she encountered them in the VIP
room.

The VIP
room was tiny, only six or seven feet long, but J.J.
stated that he did not recall seeing Kelly or Chat in there because he was not
paying attention.  He denied saying to
Samantha or Sheena, AYou need to jump on this girl,@ or words
to that effect.  Samantha stated that, at
first, she did not see Chat while she was smoking the blunt with Sheena, but
then she noticed Chat dancing and saw a gun in Kelly=s
waistband.  Kelly testified that he did
not have a gun on him at the club but that he had a nine millimeter gun in his
car.[14]

Chat
stated that she saw J.J. walk into the room, talk to
somebody, and walk back out.  She
testified that when J.J. walked back out, 

I like felt like somebody was staring at me.  And when I looked up, it was Samantha, and
she was staring at me.  And then I just
kind of like put it together.  I was
like, Oh, he must have been coming in here and talking
to them, or whatever.  And then he stuck
his head back in the door, you know, and . . . [moved his head] like, you know,
what=s up or what y=all going to do or
something like that.

 

Chat testified that this was the
first time that she had seen Samantha since their fight and that Samantha
looked different because she was wearing an orange wig.  Chat stated that Sheena stared at her too.[15]  On cross-examination, Chat testified that
Samantha looked away when Chat looked back, avoiding eye contact and moving her
head to keep her hair in her face.

Kelly
testified that after he and Chat had been sitting in the VIP room for a minute,
it seemed like J.J. Ajust
materialized,@ startling him.  J.J. did not say
anything to him; he leaned over to talk to someoneCKelly
could not see who it wasCand then left.  A few minutes later, J.J.
returned.  Kelly said that he tried to
ignore this but felt like something was about to happen.  He said that Chat identified Samantha as the
woman she had fought at J.J.=s
apartment.  Kelly stated that he figured
he and Chat would just wait them out because they were blocking the door and he
did not feel like they had any other options.

Chat
testified that she thought something was going to happen because of the way J.J. was acting, making her think that he was going to have
Sheena and Samantha Ajump@ on
her.  She told Kelly, ADon=t let them jump on me.@  But then, instead of leaving, Chat got up and
started to dance in front of Kelly.

Kelly
said that while Chat was dancing, he watched Samantha and Sheena.  He stated, AI noticed
a couple of times that [Sheena] . . . was throwing gang signs and . . . raising up her shirt. 
I guess she was showing a tattoo. 
But, you know, it was just kind of like posturing.@  He thought they were Atrying to
get their nerves up to go ahead and jump [Chat].@  Kelly said that as soon as Chat asked him not
to let them jump on her, he stood up at her side to protect her.

Chat
testified that she was the only one dancing and that Samantha and Sheena
started closing in on her.  Samantha
testified that she watched Chat and that she received the impression that
something might happen between Chat and Sheena because they were Aplexing@CApicking
with each other@ while dancing.








Chat and
Kelly both testified that Sheena elbowed Chat as Sheena and Samantha left the
VIP room.  Chat stated that she staggered
first, Abumped it
back,@ then
turned around and hit Samantha in the face because she thought Samantha was
going to attack her from behind.  Chat
said that Kelly jumped up and tried to break up the fight as it spilled out
into the hallway.  Kelly testified that
Chat went after Sheena when Sheena bumped her and he tried to break it up.  Samantha testified that Kelly hit her and
that she did not know where Sheena went while she was fighting Kelly and
Chat.  Kelly said that he did not hit
Samantha.

(2) In
the VIP RoomCDVD

Both
parties published a seven-minute security DVD from the VIP room to the
jury.  The DVD shows part of the small
dark room and has no audio.  The VIP room
contains a sofa next to a lamp on one wall. 
Against an adjacent wall, there is a laptop computer, a flat screen
television above the laptop, and a chair next to the laptop.  From the number of people that pass through
the room, it appears that there are two exits.

When the
DVD begins, J.J. is swaying and smoking while
standing in front of Sheena.  Sheena sits
on the sofa near the lamp.  J.J. leaves, walking past where Kelly and Chat sit.[16]  A female in a black shirt with ASTAFF@ in white
on the back sits down next to Sheena and they appear to talk.  Samantha sits on the arm of the chair next to
the laptop, across the room from Kelly and Chat.  She hands a blunt to Sheena and walks over to
where Kelly and Chat are sitting before walking back to the chair.

Around a
minute later, J.J. walks back into the room and hands
Samantha a blunt on his way to Sheena. 
He appears to greet the staffperson and to
dance with Samantha for a moment.  He
looks in Chat and Kelly=s direction while he dances and
drinks.

Sheena
stands when J.J. walks over to her, but she is
initially blocked from the camera=s view by
the staffperson, who stands up and takes the blunt
from Samantha.  Sheena and Samantha pass
the blunt back and forth several times.  J.J. greets other people as they enter the VIP room, and he
throws some gang signs before walking back out. 
Chat first appears on the DVD moments later at the bottom left portion
of the screen, dancing with a drink in her hand.

Samantha
alternates between sitting on the arm of the chair and standing up,
occasionally moving in place.  Three
people file in and sit on the sofa where Sheena had been sitting.  Sheena dances behind Chat while smoking,
gradually moving closer to her.  Other people
file in and out of the small room, standing, dancing, chatting with Sheena or
Samantha, and from time to time, walking between where Sheena and Chat are
dancing. When Sheena turns her back to Chat and Kelly, Sheena lifts up the back
of her shirt while continuing to dance.

At one
point, Samantha appears to stand next to Chat before returning to sit back down
on the chair by the laptop.  Chat
continues to gyrate with a drink in one hand. 
Chat leans down out of the camera=s view,
and then Kelly stands up.  Chat sways
alongside him while Sheena and Samantha pass their blunt back and forth and
sway in front of them.  A male staffperson talks to Sheena and Samantha, and then Samantha
hands a purse to Sheena.  Sheena appears
to make some farewells to the people on the sofa and heads toward an exit.  The DVD is unclear as to whether Chat touches
Sheena as Sheena walks past her, but Sheena clearly bumps Chat and then a fight
ensues.

(3)
Outside the VIP Room

Bouncers
broke up the fight pretty quickly. 
Samantha stated that, once outside of the VIP room, she and Sheena
separated to find J.J.  J.J. stated that
five to ten minutes after he left the VIP room, Sheena and Samantha ran back
around to the photo area, demanding to leave. 
Samantha was carrying her wig Alike
someone had knocked it off her head.@

J.J. said, AEverybody in the club was telling us, >Go on,
leave,=@ but he
also said that security did not ask Samantha and Sheena to leave.[17]  He said that he did not know that Samantha
and Sheena had been in a fight with Chat until the next day.  But Samantha testified that although she did
not tell him right then that someone had hit her, Sheena told J.J. about it. 
Samantha supposed this made J.J. mad, and A[h]e was
already drunk.@ 
She gave the following testimony about Sheena having a weapon:

Q.  So Sheena came up to y=all while you were talking
to [J.J.]?

 

A.  No.  We made itCshe was in the hallway, the hallway [outside the
VIP room] . . . .  She was in that
hallway.  She pulled outCI guess there was a
gun.  She had a gun.  It was pulled out in that hallway. EverybodyCit was just commotion, you
know.  [J.J.]
was like, [A]Where=s Sheena?[A]  By this time, she was coming backCthe security guards was
[sic] trying to, I guess, maybe make her leave out orCI really don=t know what they were
trying to do.

 

. . . . 

 

Q.  You said something about a
gunCjust now.  Sheena had a gun?

 

A.  Yeah.

 

Q.  When did you see Sheena with
a gun?

 

A.  When I had done found my
brother [J.J.] and thatCit wasCit was commotion.  She was in that hallway.

 

Samantha added that she did not
see the gun again but guessed that Sheena had put it in her purse.

Security
escorted Chat and Kelly from the club. 
Once outside, Chat realized she did not have her purse; security would
not let her back in but allowed Kelly to go back to look for it.  Five or ten minutes later, he rejoined Chat
without the purse and told her to get in the car.  Kelly said he tried to collect himself once
they were in the car, and then he put the gun that had been under his seat Ain
between the console@ and the side of the seat.  He started to slowly drive out of the
Afterlife=s parking lot the same way he had
come inCby the
Afterlife=s front entrance.

J.J., Samantha, and Sheena were starting back to the
Suburban when Roy saw them.  He stated, AIt seemed like [J.J.] was
upset, and it really, to me, it seemed like something happened.  So it seemed like something had happened, and
he was upset and readyClike he was ready to do something,
you know.  I mean, I just remember him
talking about having a tool@ and
about having a pistol and wanting to do something.  Roy added that he believed Atool@ meant Agun.@

Roy
walked towards J.J. because he wanted his valet
fee.  When he shined his flashlight on
Sheena=s purse,
he saw a gun, which he described as semi-automatic and chrome-plated or
nickel-plated.  He testified that he
said, AY=all need
to take that somewhere else,@ and that
Sheena told him that it had nothing to do with him in a manner that he
described as Akind of subtle, you know, like
serious.@  He did not take her remark as a threat
towards him.

Sheena
climbed into the Suburban=s front passenger seat and
Samantha climbed into the back, but they did not leave immediately.  Roy stated that J.J.
had his window down.  Roy persisted in
trying to get his valet fee and did not recall seeing either J.J. or Sheena with a gun at that point.  Samantha and Roy both recalled J.J. and Sheena talking about what had happened inside the
club; Roy added that J.J. talked about fighting
someone and said something like, AIt can
happen right here.@ 
At that, Roy concluded, he would just get his fee later.[18]

b.  The Shooting

On
appeal, the parties do not appear to dispute that Kelly shot Sheena but
challenge whether the great weight of the evidence shows that his actions were
justified.

                            (1)  Chat and Kelly=s Version

Chat
testified that as Kelly approached the parking lot exit, she saw Samantha
standing next to the Suburban, talking to J.J., who
was in the driver=s seat.  She yelled for Kelly to stop the car as they
passed the Suburban.  Kelly described
Chat making a high-pitched sound and then screaming for him to stop.  Kelly said that when Chat said Astop,@ he
stopped the car toward the front of the parking lot, in front of the Suburban.[19]

Chat
rolled down her window and, according to Kelly, began to tell J.J. in Achoice
words that he needs to just leave that alone and she was just tired of him.@  Chat said that she and J.J.
locked eyes and she cussed at him, saying AYou know you wrong for this@ and AStop
messing with me.  And why are you still
tripping?  Why are you still fucking with
me?  Why are you on this bullshit?@  Sheena=s window
was down, and she and Sheena ended up in a Acuss
fight.@

Kelly
said that J.J.=s eyes
lit up when he saw Chat and then A[J.J.] told her choice words back.@  He saw something in J.J.=s hand
that he thought was a gun, and then J.J. said, ABitch, I=ll kill you.@  Chat described J.J.=s
reaction as A[i]t
was like fuck you, fuck you, fuck you; just a whole lot of fuck yous going back and forth. 
And he waved a gun and he put the [Suburban] in gear and he came around.@  When she saw the gun, she told Kelly, AHe got a
gun.  Like, Oh, shit.@  Kelly said he was already aware of the gun at
that point.  He said that he had not
picked up his gun at that point and that A[w]hoever said they seen a gun or said that I picked up a gun
then is a liar . . . .  They=re lying, because I didn=t pick up
a gun yet.@

Kelly
drove out of the parking lot, turned right, and then stopped the car,
explaining:

The thingCthe thing that I=m thinking, I=m knowing he got a gun,
and I=m just feeling like ifCif he going to do
something to me, I=m not going to have a wayCI=m not going to have no way
to protect myself or defend myself, because whoever in that car, they can shoot
me straight through the back of the car, shoot anybody in the car, just shoot
through the car window. 

 

 








He grabbed his gun and got out of
the car, explaining on cross-examination that he did it not only to take a
defensive position but also to give J.J. a chance to
leave without any problems.

The
Suburban exited the parking lot, turned right, and came around at themCChat said
that she thought she saw three people in the vehicle.  Kelly said that, as the Suburban entered the
road from the parking lot, he thought, A[T]hey=re going
to come this way and they fixing to do something.@  Kelly stated that he knew anyone in the
Suburban could kill him or Chat but that he did not know which of the Suburban=s
occupants, other than J.J., had a weapon.  He did not know that Sheena had a gun.

Kelly
raised his gun and started shooting.  He
said that he was aiming Aat nothing in particular@ nor at
anyone in the Suburban and that he was just shooting in the Suburban=s
direction A[b]ecause
they was coming toward me, and from everything that had happened up until that
moment, it told me that when they came toward me, they was going to start
shooting.@ 
He testified that he was in fear for his and Chat=s lives
and that he was trying to save their lives by scaring the Suburban=s
occupants away.  He did not remember how
many times he fired the gun.

Chat
testified that once the Suburban turned, she heard Aboom,
boom@ from J.J.=s
vehicle, which sounded like two gunshots to her, but she did not see any shots
fired.  The next series of Abooms@ sounded
like they came from right next to her, then Kelly got back into the car, and
they drove to Dallas.  Chat testified
that she had not realized until then that Kelly had gotten out of the car.

Kelly
said that after the Suburban drove past him, he got back in the car and threw
the gun in the back seat.  He was not
sure that anyone in the Suburban shot at him.[20]  After he left Chat on February 25, Kelly
threw the gun off the side of the highway and returned the red car to its
owner, Aa guy
[he] knew who owned a car lot.@  Kelly did not see any bullet holes in the
car.

Kelly
stated that he did not want the confrontation to happen that night, he did not
want to shoot anyone that night, and he did not want Sheena to die. He Ajust didn=t want to get shot [him]self,@ and he did not want Chat to get
shot.  Chat and Kelly both said that they
did not find out until later that Sheena had died.

(2) J.J.=s Version

J.J. stated that the red car pulled up and stopped in
front of the Suburban and that Samantha told him that the people in the car had
a gun but he did not see one.  ANext[,] the [red] car pulled out some, pulled in the
street and stopped.[[21]]  That=s when
Chat was getting out of the car and she was hollering.  And Sheena rolled the window down.  They went to hollering back and forth at each
other.@  J.J. testified that
he saw Kelly get out of the car, go to the back of it, squat down, and start
firing.  He did not see Kelly point the
gun.

J.J. ducked down, put the car in drive, Asmashed@ the gas,
drove Aup the
street,@ made a
U-turn, drove back down the street, and pulled into a nearby gas station.  He did not know if the shooting continued
while he drove away.      

(3)
Samantha=s Version

Samantha
stated that the red car pulled up in front of the Suburban and stopped,
blocking it in.  She told J.J., AThat=s them
right there.@ 
She added, AI guess it was Chat on the
passenger side,@ and she guessed that Chat had
the gun.  The red car then pulled on to
the side of the Suburban.  Samantha heard
Chat say, ANah, nigger, don=t run
now,@ and then
Chat and Kelly stepped out of the red car. 
Samantha did not see whether either had a gun because she Awasn=t trying to see no more@; she let
herself out of the Suburban and crawled under a nearby car.  She heard shots fired, but she did not see
who was shooting or see if there was more than one gun.  She said that the Suburban moved after the
shots were fired and drove east down Avenue E, then made a U-turn, but she also
said that she did not see J.J. drive away and that
she did not see J.J. stop anywhere.

(4) Donna=s Version

Donna had
parked her car in the parking lot on the left-hand side of the club.  She saw J.J.=s window
was open (Acracked some@), but
she did not stop to talk with him.  As
she continued to her car, she heard gunshots. 
She turned and saw J.J.=s
Suburban pulling out and a guy standing in front of a red car, shooting at the
Suburban.  Chat was in the car=s front
seat.  Donna did not see J.J. or Sheena point a gun. 
She stated that the Suburban was already out in the street when she
heard the first gunshot and that the Suburban drove past the shooter.

(5) Roy=s Version

Roy
testified that the Suburban pulled out first and stopped in the middle of the
street in the inside lane (Athe lane
closest to the middle@)CAlike
right in between the club entrance and about the end of the median.@[22]  Then the red car pulled out behind it into
the outside lane (Athe lane closest to the club@) and
stopped behind the Suburban.  Kelly got
out of the red car, walked in front of the red car, stopped about two feet from
the Suburban in the area between the back door crevice and the front door on
the passenger side, and started shooting inside of it.  Roy stated that, as far as he could tell, no one in the Suburban fired back and that four to
seven shots were fired.  After that,
Kelly returned to the red car and pulled out.

The
Suburban pulled off to the left.  Roy saw
the Suburban reappear at a nearby gas station but did not see J.J. get out of the vehicle or drive away.

c.  At the
Hospital

J.J. first realized Sheena had been hit when he pulled
into the gas station.  He took her to
nearby Arlington Memorial Hospital (the AHospital@), where
she remained for the next seven and a half hours before she was pronounced dead
from a gunshot wound to her head.[23]

Arlington
Police Officer Chris Janssen testified that he heard a shooting call from the
Hospital around 4:37 a.m. on February 25 and found J.J.,
who had blood on his shirt and pieces of skull on his clothing, in the waiting
room.  J.J.
identified Chat as someone involved in the shooting.

Arlington
Police Detective Benjamin Lopez and another detective interviewed J.J., Samantha, Cyntrell, and
Donna on February 25.  Officer Janssen
testified that J.J. appeared upset and in shock when
he spoke with him; Detective Lopez testified that J.J.
was not incoherent or so intoxicated that he could not communicate.

4.  After February 25,
2007

J.J. told the police that the Suburban belonged to his
girlfriend Telethia and that he could not give them
permission to search it.  Once they
received permission to search the Suburban, police
found Sheena=s purse, containing marijuana and
$480 in cash.  J.J.
testified that he did not take anything out of Sheena=s purse,
that he had not seen her with a gun, nickel-plated or otherwise, that evening,
and that he did not throw anythingCnot a
handgun or a shell casingCout of the Suburban. 

J.J. kept a black .45 caliber handgun hidden under the
Suburban=s
console.  The police found it loaded and Acocked
and locked,@[24] with
Sheena=s blood
on it.[25]  J.J. testified that
he never kept the gun loaded, never shot it, and did not remember loading it or
cocking it, although he also stated that it is something that he would have
done if he had had the chance.  He did
not remember grabbing the gun at any time during the incident, but he
acknowledged that it was possible that he did. 
When he spoke to the police on February 25, he did not mention his .45
in the Suburban.[26]

Photographs
of the Suburban=s interior show a jacket placed
in the back seat, covering part of the console and the floorboard.  J.J. testified that
he did not place the jacket there to cover up either drugs or blood, both found
in the Suburban.  However, Detective
Lopez testified that the coat had to have been placed there after the shooting
or it would have had blood on it.  He
testified that J.J. had obviously hidden the gun
under the console and agreed that, from the gun=s bloody
condition, J.J. had obviously had the gun out at some
point.

Detective
Lopez looked for Chat.  At Club Hard
Bodies, he found Dwight, who provided Chat and Kelly=s photos
taken at the Afterlife on Valentine=s
Day.  Detective Lopez located Chat=s family,
who gave police information to identify Kelly, and Roy identified Kelly from
one of Dwight=s photos as the person the police
were looking for.

Ozuna testified that she did not find any bullet
defects in the front of the Afterlife. 
Detective Lopez testified that, from the photographs of the Suburban,
there were no gunshot defects and it did not appear to have been hit by gunfire
on the wheels, rims, anywhere on the vehicle=s body,
or on the inside.[27]  The Suburban=s glass
was completely intact, meaning that Sheena=s window
would have had to have been down at the time she was shot, and from the amount
of blood inside the Suburban, Sheena could not have been shot while sticking
her head outside the window.  Sheena=s wound
was a Athrough-and-through@ wound,
meaning that there was an entry wound and an exit wound, but police did not
find a projectile in the Suburban.

B.  Standard of Review

Because
self defense is classified as a defense rather than an affirmative defense, we
apply the factual sufficiency review generally applied to convictions to an
appellant=s factual sufficiency challenge
to the jury=s implicit finding against his
self defense claim.  Bundy v. State,
280 S.W.3d 425, 433 (Tex. App.CFort
Worth 2009, pet. ref=d).

When
reviewing the factual sufficiency of the evidence to support a conviction, we
view all the evidence in a neutral light, favoring neither party.  Steadman v. State, 280 S.W.3d 242, 246 (Tex.
Crim. App. 2009); Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).  We then ask whether the evidence supporting
the conviction, although legally sufficient, is nevertheless so weak that the factfinder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the factfinder=s
determination is manifestly unjust.  Steadman, 280 S.W.3d
at 246; Watson, 204 S.W.3d
at 414B15, 417.  To reverse under the second ground, we must
determine, with some objective basis in the record, that the great weight and
preponderance of all the evidence, although legally sufficient, contradicts the
verdict.  Watson, 204 S.W.3d at 417.

Unless we
conclude that it is necessary to correct manifest injustice, we must give due
deference to the factfinder=s
determinations, Aparticularly those determinations
concerning the weight and credibility of the evidence.@  Johnson v. State, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000); see Steadman,
280 S.W.3d at 246. 
Evidence is always factually sufficient when it preponderates in favor
of the conviction.  Steadman, 280 S.W.3d at 247; see Watson, 204 S.W.3d
at 417.

C.  Analysis

Kelly
argues that A[t]he greater weight and
preponderance of the credible evidence herein shows that [he] acted in
self-defense from the apparent danger created by the anticipated attack of
multiple assailants not only of himself but of a third party, [Chat], so that
it is manifestly unjust@ that he was convicted of
murder.  He contends that both Sheena and
J.J. were armed that night and had used illegal
substances, that there had been a prior fight between Samantha and Chat, that J.J. had threatened to kill Chat, that there had been a
fight between Chat and Sheena in the club immediately prior to the shooting,
that Chat expressed a reasonable fear of multiple assailants to Kelly, and that
the occupants of J.J.=s vehicle
fired first.  And he states that A[v]irtually every witness whose story conflicts with [his] has
a prior criminal record,@ making his testimony more
credible than theirs.

The jury
had to determine whether Kelly intentionally or knowingly caused Sheena=s death
by shooting at her (or at J.J.)[28]
with a deadly weapon, or whether he intentionally,
with the intent to cause serious bodily injury to Sheena (or J.J.), committed an act clearly dangerous to human life by
shooting at Sheena (or J.J.) with a firearm, causing
Sheena=s
death.  See Tex. Penal Code Ann. ' 19.02(b)(1), (2).  If the
jury found that Kelly committed these acts, then to acquit him, it would have
had to find that Kelly was justified in using force or deadly force to defend
himself or Chat.

According
to the law in effect at the time of the shooting,[29]
a person is justified in using deadly force against another (1) if he would be
justified in using force against another under section 9.31, (2) if a
reasonable person in his situation would not have retreated, and (3) when and
to the degree he reasonably believes the deadly force is immediately necessary
to protect himself against the other=s use or
attempted use of unlawful deadly force or to prevent the other=s
imminent commission of murder, among other offenses.  See Act of May 27, 1995, 74th Leg., R.S., ch. 235, ' 1, sec.
9.32, 1995 Tex. Gen. Laws 2141, 2141 (amended 2007); see also Davis v. State,
268 S.W.3d 683, 697B98 & n.3 (Tex. App.CFort
Worth 2008, pet. ref=d).  At the time that this version of penal code
section 9.32 was effective, section 9.31 provided that a person is justified in
using force against another when and to the degree he reasonably believes the
force is immediately necessary to protect himself
against the other=s use or attempted use of
unlawful force.  See Act of June
19, 1993, 73rd Leg., R.S., ch.
900, ' 1.01,
sec. 9.31, 1993 Tex. Gen. Laws 3586, 3598 (amended 2007).  The use of force against another is not
justified in response to verbal provocation alone, nor is it justified if the actor
provoked the other=s use or attempted use of
unlawful force unless the actor abandons the encounter or clearly communicates
his intent to abandon while reasonably believing that he cannot safely abandon
the encounter and the other person continues or attempts to use unlawful force
against him.  See id.  A person is justified in using force or
deadly force against another to protect a third person if, under the
circumstances as he reasonably believes them to be, he would be justified in
using force or deadly force to protect himself, and he reasonably believes that
his intervention is immediately necessary to protect the third person.  See Tex. Penal Code Ann. ' 9.33
(Vernon 2003).

We
conclude that there is factually sufficient evidence to support the jury=s
determination that Kelly did not act in self defense or in Chat=s
defense. That is, there were fact questions before the jury with regard to
whether, from Kelly=s standpoint, his use and degree
of deadly force was immediately necessary to protect himself or Chat; whether a
reasonable person in Kelly=s
situation would have retreated; whether Kelly reasonably believed that he or
Chat was in danger of death or serious bodily injury; and whether Kelly
provoked J.J.=s (or
Sheena=s) use or
attempted use of unlawful force and failed to abandon the encounter or clearly
communicate his intent to abandon the encounter.  That is, the jury could have concluded from
the evidence above (1) that Kelly and Chat had the opportunity to retreat
several times that night and that a reasonable person would have, (2) that
Kelly=s
shooting Sheena (or shooting at J.J. and hitting
Sheena) was in response to only verbal provocation immediately prior to the
shooting and that J.J. or Sheena did not draw a
weapon first (if at all), or (3) even that Kelly and Chat went to the Afterlife
intending to provoke a confrontation and failed either to abandon the encounter
or to clearly communicate their intent to abandon the encounter.

Additionally,
while it is undisputed that several of the actors had possession of a firearm
at one time or another during the evening, the only evidence of shots actually
fired (other than Chat=s testimony) consists of the nine
shell casings from the same nine millimeter gun, the type of gun that Kelly
carried, admitted shooting at the Suburban, and then destroyed.  The jury could have chosen not to believe
Chat=s
testimony that J.J. fired at Kelly first,
particularly in light of Kelly=s
testimony that there were no bullet holes in the car he drove that night.  In short, the jury had the responsibility to
determine witness credibility and could have chosen who and what portion of
testimony to believe and to disbelieve. 
We cannot say, viewing the evidence in a neutral light, that the jury=s
determination is clearly wrong and manifestly unjust or that the conflicting
evidence so greatly outweighs the evidence supporting Kelly=s murder
conviction that the jury=s determination to implicitly
reject Kelly=s self defense and defense of
others claims is manifestly unjust.  See Watson, 204 S.W.3d
at 414B15,
417.  We overrule Kelly=s first
point.

IV.  Closing Argument

In his
second point, Kelly complains about the following italicized portions of the
State=s closing
argument during the trial=s guilt-innocence phase:

[State]:  . . .  First, you have to consider, is the Defendant
guilty of murder?  Did the Defendant
intend to kill Sheena Perkins, or did he intend to kill J.J.
Coffey and instead strike Sheena and kill Sheena? And the
answer=s yes.  If you find that the Defendant committed
murder, then and only then will you consider self-defense.

 

[Defense]:  I=m going to object to that,
Judge.  That=s
a misstatement of the law.  That=s not the state of the law.  They don=t have to find murder before they get to
self-defense.  That=s
a clear misstatement of the law. 

 

[State]:  Judge, if they find him
not guilty, they don=t get
to self-defense.

 

The Court:  All right.  Overruled. 

 

 








[State]: . . . .  And there are
two requirements here that are very, very important.  And the first is, if I=m going to use deadly
force, there has to be a duty on my part to retreat before I use that deadly
force.  And that duty, when you-all look
at it, will be from each one of your perspectives. All right?  Not from whether the Defendant could see a
duty to escape or could see an avenue of escape; whether you-all, placed in
that situation that night on the 25th of February of 2007 in Tarrant County,
Texas, would have retreated.

 

[Defense]:  Well, I=m going to object to that,
Judge, as a misstatement of the law.  It=s not what these folks would have done.  It=s what an ordinary, reasonable, prudent person
would have done in the Defendant=s shoes.

 

[State]:  I would submit that
these 12 jurors, Your Honor, are ordinary and reasonable and prudent
individuals.

 

The Court:  I am going to sustain
the objection.

 

[Emphasis added.]

We
initially note that Kelly did not preserve his second objection.  See Tex. R. App. P.
33.1(a); Young v. State, 137 S.W.3d 65, 69
(Tex. Crim. App. 2004) (AThe
essential [preservation] requirement is a timely, specific request that the
trial court refuses.@ (emphasis added)). 
With regard to his first objection, Kelly complains that the State=s
argument that the jury must have first found that he committed murder before it
considered self defense is Aa clear
misstatement of the law and the instructions given in the charge.@

A.  Standard of Review

To be
permissible, the State=s jury argument must fall within
one of the following four general areas: 
(1) summation of the evidence; (2) reasonable deduction from the
evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement.
 Felder v. State, 848 S.W.2d 85, 94B95 (Tex.
Crim. App. 1992), cert. denied, 510 U.S. 829 (1993); Alejandro v.
State, 493 S.W.2d 230, 231 (Tex. Crim. App.
1973).

If a jury
argument exceeds the bounds of proper argument, a trial court=s
erroneous overruling of a defendant=s
objection is not reversible error unless it affected the appellant=s
substantial rights.  Tex. R. App. P. 44.2(b); Martinez v. State, 17
S.W.3d 677, 692B93 (Tex.
Crim. App. 2000); Mosley v. State, 983 S.W.2d
249, 259 (Tex. Crim. App. 1998) (op. on reh=g), cert.
denied, 526 U.S. 1070 (1999).  In
determining whether the appellant=s
substantial rights were affected, we consider (1) the severity of the
misconduct (i.e., the prejudicial effect of the prosecutor=s
remarks), (2) curative measures, and (3) the certainty of conviction absent the
misconduct.  Martinez,
17 S.W.3d at 692B93; Mosley,
983 S.W.2d at 259.

B.  Analysis

Assuming
without deciding that overruling Kelly=s
objection was error, we hold that it was harmless, and we reject Kelly=s
argument for two reasons.  First, the
timing is immaterial.  If, as argued by
the State, the jury first found that Kelly committed murder but then found that
he was acting in self defense, he would have been found not guilty.  If, as argued by Kelly, the jury believed
that he acted in self defense, and therefore did not commit murder, he also
would have been found not guilty.  See Saxton v. State, 804 S.W.2d
910, 913 (Tex. Crim. App. 1991) (A[T]he
State has the burden of persuasion in disproving the evidence of self‑defense. 
That is not a burden of production, i.e., one which requires the
State to affirmatively produce evidence refuting the self‑defense
claim, but rather a burden requiring the State to prove its case beyond a
reasonable doubt. . . . [C]ase
law instructs us that the issue of self‑defense
is an issue of fact to be determined by the jury.@) (internal citations omitted). 
The bottom line is that Kelly presented his self defense theory, and the
jury disbelieved it.

Second,
we turn to the three Martinez factors and recall that for an improper
jury argument to warrant a reversal, it must be Aextreme
or manifestly improper.@ 
Guidry v. State, 9 S.W.3d 133, 154
(Tex. Crim. App. 1999), cert. denied, 531 U.S. 837 (2000).  The first factor weighs in the State=s favor
because the prosecutor=s conduct was mildly prejudicial,
if at all, making this argument only once and not commenting on Kelly=s
presentation of self defense evidence. 
No curative measures were taken after the trial court overruled the
objection; however, the certainty of conviction tips the balance in the State=s favor
because, as previously explained, the complained-of argument did not touch upon
the case=s facts
regarding self defenseCa fact issue to be determined by
the jury.  See Adelman v. State, 828 S.W.2d 418, 421 (Tex. Crim.
App. 1992).  Therefore, assuming the
trial court erred by overruling Kelly=s
objection, the error was harmless.  We
overrule Kelly=s second point.

V. 
Conclusion

Having
overruled both of Kelly=s points, we affirm the trial
court=s judgment.

 








 

 

PER
CURIAM

 

PANEL:  MCCOY, GARDNER, and
WALKER, JJ.

 

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  September 30, 2010











[1]See Tex. R. App. P. 47.4.





[2]J.J. testified that he had a
bargain with the State that nothing new he admitted during his testimony would
result in prosecution and that he hoped his testimony would result in a
reduction of his federal jail time.  J.J. had prior convictions for delivery of a controlled
substance (cocaine) and possession of a controlled substance (cocaine) and
pending drug charges. 





[3]Sheena had her own
criminal history, having pleaded guilty to the offense of making a terroristic
threat, a class B misdemeanor, for threatening to commit murder or aggravated
assault. 





[4]Chat also had a criminal
history, serving ten months in state jail for violating her community
supervision on a drug possession offense.





[5]Samantha and J.J. are actually cousins. 
In exchange for her testimony, Samantha=s pending misdemeanor
evading arrest charge was reduced to a disorderly conduct charge.





[6]Donna testified that she
had heard some of the threats exchanged between J.J.
and Chat, that J.J. asked her to fight Chat, and that
she would have if they had found her.  She testified at trial in jail clothes because
she had been convicted in 2008 of possession of a controlled substance
(cocaine) with intent to deliver.  Her
other convictions were for credit card abuse, misdemeanor theft by check, and
forgery. 





[7]As a Avalet,@ Roy charged fees to
direct patrons to parking spaces.





[8]J.J.=s friend Donna testified that she was at the
Afterlife after 2 a.m.





[9]Samantha also smoked around
five blunts that night.





[10]Samantha testified that
she did not feel like security was really serious about patting people down and
that she could have brought a gun into the club if she had wanted to.  She testified that she was probably carrying
a pocketknife that night, stating, AI always have a knife if I
go in a club.  Always.@





[11]Police used these photos
to identify Kelly after the shooting.





[12]Per the photographs
admitted at trial, if Kelly and Chat=s estimation of their arrival time was correct,
they would have been waiting around the same area where J.J.=s Suburban was parked.





[13]On cross-examination,
Kelly denied that he said to Chat, ADon=t worry about that N-word,
I got it.@





[14]Crime scene investigator
Susan Ozuna testified that all of the casings she
found at the crime scene were nine millimeter RP Luger shell casings of the
same brand.  Tarrant County Medical
Examiner=s Office firearms examiner
Jamie Becker testified that she examined the nine shell casings, all from nine
millimeter Luger cartridges and all fired from the same unknown firearm.





[15]Chat did not know Sheena
but had been told that she was Monty=s sister and had seen her in a photo with Monty, O.C., and J.J. at J.J.=s apartment.  After Chat was thrown out of the Afterlife,
she saw Monty in the parking lot.  When
he denied that Sheena was his sister, she replied,AYou know who I=m talking about.  Whoever she is, you need to get her because
she wrong.A





[16]The DVD does not show Chat
and Kelly=s entrance.  We infer that they were already present at
this point from Chat=s testimony that she and
Kelly were off-camera where they sat and from Chat=s sudden appearance in the
lower left side of the room (as if she stands up from sitting in a location out
of the camera=s view) about halfway
through the DVD.





[17]Donna testified that,
contrary to what she told police on February 25, she did not see security evict
Samantha and Sheena from the club.





[18]Roy stated,

 

[J]ust
my own intuition, because I don=t remember whether it was something that they said
about the other vehicle approaching or not. 
I just remember something just told me to back up, because I seen he wasn=t paying me any attention,
you know, and something obviously was happening or going to happen.  That=s what was going through my mind, you know, and I
had already seen a weapon in the carCI mean[,] on the
girl.  So I figure that, you know, I
probably need to leave it alone.  I=ll see him again.

 





[19]On cross-examination, Chat
said that Kelly did not completely stop the car until they were out of the
parking lot.  AHe pulled right up on the
curb and stopped.@





[20]On cross-examination, Chat
gave the following testimony:

 

Q.  But you=re sure that J.J. started shooting first?

 

A.  Yes.

 

Q.  And if it was otherwise, first of all, he=d be
in trouble, right?

 

A.  Who?

 

Q.  Your baby=s daddy [Kelly].

 

A.  Say that again.

 

Q.  I mean, if [Kelly] shot first, that wouldn=t look good, would it?

 

A.  No, it wouldn=t.





[21]J.J. subsequently clarified
that he meant Ahalfway in the parking lot
and halfway in the street@ at an angle.





[22]Avenue E East has two
lanes going east and two lanes going west, separated by a grass
median.





[23]Tarrant County Deputy
Chief Medical Examiner Marc Krouse, who performed
Sheena=s autopsy, stated that the
entry wound was on Sheena=s right forehead, just
above the outside of her eyebrow, and that the exit wound was on her head=s left side.





[24]The State=s firearms examiner
explained that Acocked and locked@ means that the weapon has
a round chambered and the hammer is on the rear (Acocked@), but that the thumb
safety is still on (Alocked@).  ACocked and unlocked@ means that the weapon is
ready to fire.





[25]A substantial amount of
blood from Sheena=s injury was deposited on
the inside of the Suburban.





[26]Becker testified that
based on her microscopic comparison on the nine cartridge cases found in the
Afterlife parking lot and the street, it was impossible for the cartridges to
have been fired from a .45.  Becker
stated that one reason no .45 casings were found in the parking lot was because
the cartridge remains in a revolver like the .45 after firing until it has been
physically opened and removed.  In a
semi-automatic, the cartridges are extracted and ejected for the next cartridge
to be fed into the chamber.





[27]Officer Durham arrived at
the Hospital around 4:50 a.m. on February 25 and secured the Suburban but did
not touch the vehicle or notice any bullet holes in its driver or passenger
sides.





[28]The jury was instructed on
the law of transferred intent.  See
Tex. Penal Code Ann. ' 6.04(b)(2) (Vernon 2009). 





[29]The legislature has since
amended penal code sections 9.31 and 9.32, but the offense for which the jury
convicted Kelly occurred on February 25, 2007, before the September 1, 2007
effective date of the amendments.  Our
analysis of Kelly=s appeal is therefore
governed by the earlier statutes.  See
Act of June 19, 1993, 73rd Leg., R.S., ch. 900, ' 1.01, sec. 9.31, 1993 Tex. Gen. Laws 3586, 3598, and
Act of May 27, 1995, 74th Leg., R.S., ch. 235, ' 1, sec. 9.32, 1995 Tex. Gen. Laws 2141, 2141, both
amended by Act of March 27, 2007, 80th Leg., R.S.,
ch. 1, ' 5, 2007 Tex. Gen. Laws 1, 2 (codified as an
amendment to Tex. Penal Code Ann. '' 9.31, 9.32 (Vernon Supp. 2009)) (stating that an
offense committed before the act=s effective date is governed by the sections in
effect when the offense was committed).